1  ROPES & GRAY LLP
   Jeffrey F. Webb (CSB # 145750)
2  *jeffrey.webb@ropesgray.com*
   Three Embarcadero Center
3  San Francisco, California 94111-4006
   (415) 315 6300
4  (415) 315 6350

5

6  Attorneys for Plaintiffs
7  Stephen L. Coulombe, Robert J. Duffy,
   Elliot A. Fuhr and Berkeley Research Group, LLC

8

9          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10              **FOR THE COUNTY OF ALAMEDA**

11                 **(UNLIMITED JURISDICTION)**

12

13  STEPHEN L. COULOMBE, ROBERT J.        Case No.
    DUFFY, ELLIOT A. FUHR, and BERKELEY
14  RESEARCH GROUP, LLC, a Nevada limited  **VERIFIED COMPLAINT**
15  liability company,
                  Plaintiffs,            **FOR INJUNCTIVE AND**
16                                        **DECLARATORY RELIEF**
                                          **(Business & Professions Code Section**
17        v.                              **17200 et seq. and Code of Civil Procedure**
                                          **Section 1060)**
18  FTI, LLC, a Maryland limited liability
    company, and, FTI CONSULTING, INC., a
19  Maryland corporation, and DOES 1 to 50,
    inclusive.
20
            Defendants.
21

22

23

24

25

26

27

28

**FILED BY FAX**
ALAMEDA COUNTY

May 13, 2016

CLERK OF
THE SUPERIOR COURT
By Alicia Espinoza, Deputy

CASE NUMBER:
**RG16815828**

1    Plaintiffs STEPHEN L. COULOMBE, ROBERT J. DUFFY, ELLIOT A. FUHR
2  (the "Individual Plaintiffs"), and BERKELEY RESEARCH GROUP, LLC
3  ("BERKELEY") (and collectively with the Individual Plaintiffs, "Plaintiffs"), allege as
4  follows:

### PRELIMINARY STATEMENT

6    1.    This action concerns the latest in a series of unlawful attempts by
7  Defendants FTI, LLC and FTI Consulting, Inc. (collectively "FTI") to constrain existing
8  and former FTI employees from pursuing lawful professions of their choosing in
9  violation of settled California law.

10    2.    Plaintiffs COULOMBE, DUFFY and FUHR are current FTI employees
11  based on the East coast who have spent considerable time working for FTI in California
12  and/or for numerous California-based clients. They wish to join Plaintiff BERKELEY,
13  based in Emeryville, California, to serve and grow BERKELEY's substantial business in
14  California.

15    3.    FTI's employment agreements with COULOMBE, DUFFY and FUHR
16  purport to prevent them from pursuing their careers as they wish. Those employment
17  agreements contain expansive, overbroad, and illegal non-competition covenants, which
18  attempt to prevent the Individual Plaintiffs from engaging in a competing business—in
19  virtually any place on earth—for a period of 12 months following the end of their
20  employment with FTI. A competing business includes any business either (a) conducted
21  by FTI during the period of the Individual Plaintiffs' employment or (b) *planned or*
22  *proposed* by FTI at any time during the last two years of the Individual Plaintiffs'
23  employment at FTI.

24    4.    The Individual Plaintiffs have already been substantially harmed by the
25  non-competition provisions. They have been underpaid by FTI while FTI knew the non-
26  competition provisions deterred their employment prospects outside of FTI. And by the
27  same token, with fewer prospective employers interested in pursuing candidates with
28

---

**VERIFIED COMPLAINT**                                                          1

1    non-competition language in their employment agreements, the market value of the

2    Individual Plaintiffs' services outside of FTI has been depressed.

3         5.    FTI's non-competition provisions even purport to prevent the Individual

4    Plaintiffs from working in California for a California-based employer who is willing to

5    pay the Individual Plaintiffs a fair market rate.

6         6.    Were the Individual Plaintiffs denied the opportunity to pursue the careers

7    they wish in California, they and their clients would undoubtedly suffer great and

8    irreparable harm.  Likewise, Plaintiff BERKELEY, which seeks to grow and expand its

9    business in California, is and will continue to be irreparably harmed if it cannot attract

10   and retain some of the best talent in the marketplace without the threat of litigation.

11        7.    The State of California has a long-standing public policy against non-

12   competition provisions.  That policy is embodied in Business & Professions Code Section

13   16600, which provides that "every contract by which anyone is restrained from engaging

14   in a lawful profession, trade, or business of any kind is to that extent void."  That

15   decades-old public policy applies to those who seek to work in California for California-

16   based employers as well as to California residents.

17        8.    Therefore, pursuant to California's long-standing statutory prohibition and

18   public policy against restraints on competition, Plaintiffs COULOMBE, DUFFY, FUHR

19   and BERKELEY seek an order from this Court enjoining Defendant FTI from using,

20   enforcing or attempting to enforce the non-competition provisions in the Individual

21   Plaintiffs' employment agreements with FTI and declaring such provisions illegal, void

22   and unenforceable.

23                          **JURISDICTION AND VENUE**

24        9.    This Court has personal jurisdiction over Defendant FTI on the grounds

25   that it has purposefully availed itself of the State of California's benefits in that it has:

26   (1) purposefully directed itself at California companies and residents; (2) conducted

27   significant business activities in the state, including by soliciting, advertising, and

28   providing services to clients within the State of California, thereby generating millions of

---

VERIFIED COMPLAINT                                                                    2

1   dollars of revenue and profits in California, and by employing dozens of personnel within

2   the state; (3) derived substantial benefits from its activities in the State of California,

3   including millions of dollars of revenue and profits earned here; (4) created continuing

4   obligations between itself and residents of and employees in the State, including client

5   businesses and FTI employees based and providing services in California; and (5) is

6   registered to do business in California.

7          10.    Further, the causes of action in this complaint arise out of FTI's activities

8   in the State, in that the Individual Plaintiffs performed work in the State of California and

9   for California-based clients on behalf of Defendant FTI while FTI was holding them

10  subject to impermissible covenants not to compete.   This lawsuit implicates important

11  and fundamental California public policies and statutory prohibitions that should be

12  interpreted and enforced by a California court.   In addition, Defendant FTI's conduct at

13  issue in this action directly impacts Plaintiff BERKELEY, which is headquartered in

14  Emeryville, California in the County of Alameda.   Moreover, FTI's unlawful conduct

15  purports to affect the ability of the Individual Plaintiffs to perform services for

16  BERKELEY in California after their employment with FTI ends.

17         11.    This action is properly filed in the Superior Court of the State of

18  California, County of Alameda, because Defendant FTI, upon information and belief,

19  transacts business in the County of Alameda and the injuries that the Plaintiffs have

20  sustained and risk sustaining have occurred and will occur, in part, in Alameda County,

21  California, and the rights and/or obligations that Plaintiffs seek to be adjudicated are to be

22  enforced and/or performed within, in part, Alameda County.

23                                        **PARTIES**

24         12.    Plaintiff STEPHEN L. COULOMBE is an individual residing in

25  Newburyport, Massachusetts who will soon be moving to California to begin

26  employment with Plaintiff BERKELEY.   He will be employed by FTI as Senior

27  Managing Director of Corporate Finance & Restructuring until May 23, 2016.

28

---

**VERIFIED COMPLAINT**                                                             3

13.     Plaintiff ROBERT J. DUFFY is an individual residing in Prides Crossing, Massachusetts who will soon be moving to California to begin employment with Plaintiff BERKELEY. He will be employed by FTI as the Global Segment Leader, Corporate Finance & Restructuring until May 23, 2016.

14.     Plaintiff ELLIOT A. FUHR is an individual residing in Briarcliff Manor, New York who will soon be moving to California to begin employment with Plaintiff BERKELEY. He will be employed by FTI as Senior Managing Director of Corporate Finance & Restructuring until May 23, 2016.

15.     Plaintiff BERKELEY RESEARCH GROUP, LLC is a limited liability company organized and existing under the laws of Nevada with its principal offices in Emeryville, California.

16.     Defendant FTI CONSULTING, INC. is a Maryland corporation with its principal offices in Annapolis, Maryland.

17.     Defendant FTI, LLC is a Maryland limited liability company with its principal offices in Annapolis, Maryland. On information and belief, FTI, LLC operates as a subsidiary of Defendant FTI Consulting, Inc.

18.     Plaintiffs are ignorant of the true names, capacities, relationships, and extents of participation in the conduct alleged herein, of the Defendants sued as DOES 1-50, inclusive, but are informed and believe and thereon allege that said Defendants are legally responsible for the conduct alleged herein and therefore sue these Defendants by such fictitious names. Plaintiffs will amend the complaint to allege the true names and capacities of the DOE Defendants when ascertained.

## FACTUAL ALLEGATIONS

### A. The Employment Agreements

19.     Plaintiffs COULOMBE, DUFFY and FUHR joined Defendant FTI in 2002.

20.     Upon joining Defendant FTI in 2002, Plaintiffs COULOMBE, DUFFY and FUHR signed certain employment agreements. DUFFY's agreement was last

1   renewed in 2006, and the agreements for COULOMBE and FUHR were last renewed in

2   2008 (the "Employment Agreements"). A true and correct copy of such an agreement is

3   attached as **Exhibit A**.

4         21.   The Employment Agreements provide that "[D]uring the Restricted Period

5   (defined below), Employee will not, directly or indirectly, be employed by (where

6   Employee's employment would involve any level of strategic, advisory, technical,

7   creative, sales, or other similar input) . . . or engage in a Competing Business (defined

8   below) in any Market Area (defined below)." The "Restricted Period" is defined as the

9   period "ending twelve (12) months from the termination date of Employee's employment

10  . . . ." "Competing Business" is defined as "any line of business, in which Employee was

11  substantially engaged or about which Employee gained substantial Confidential

12  Information during Employee's employment with the Company, that is either (a)

13  conducted by [FTI] during the period of Employee's employment with [FTI] and at the

14  time Employee's employment ends or (b) planned or proposed by [FTI] at any time

15  during the last twenty-four (24) months of Employee's employment with [FTI]." The

16  "Market Area" is defined as "any place, including but not limited to the continental

17  United States, the United Kingdom and Australia, where [FTI] conducts any business, in

18  which Employee was substantially engaged or about which Employee gained substantial

19  Confidential Information, that was either conducted, planned or proposed by [FTI] at any

20  time during the last twenty-four (24) months of Employee's employment with [FTI]."

21        22.   The Employment Agreements are purportedly governed by Maryland law,

22  even though the Individual Plaintiffs worked in various states, including in California for

23  California-based companies, from offices based in New York and Massachusetts, and

24  entered into the agreements in New York and Massachusetts. In any event, California

25  has a strong public policy against contracts that purport to prohibit employment in

26  California, regardless of choice of law provisions and regardless of where the parties

27  exchanged promises.

28

---

**VERIFIED COMPLAINT**                                                            5

## B. The Individual Plaintiffs' Significant Work in California and for California-Based Clients

23.    Since last signing the Employment Agreements, the scope of Plaintiffs COULOMBE, DUFFY and FUHR's employment has significantly changed, resulting in their spending significant amounts of time in California, providing significant amounts of work in California to California-based clients, and/or managing California-based employees and California-based work from outside of California.

### 1. Plaintiff Coulombe's Significant Work in California

24.    Over the past 6 years, the scope of Plaintiff COULOMBE's work has increased significantly, resulting in hundreds of hours spent working in California and for California clients.

25.    Due to the nature of his work, Plaintiff COULOMBE has worked for, and continues to work for, several California clients.  In 2014, COULOMBE spent many days working in California for California-based clients.  In 2015, he spent nearly half of his professional time in California working on behalf of California clients, including serving as Chief Restructuring Officer for a company in Huntington Beach.  In addition, beyond those hours spent physically in California, Plaintiff COULOMBE spent time in his Boston office and elsewhere advising and working for California clients and influencing their operations in California and elsewhere.

### 2. Plaintiff Duffy's Significant Work for California-Based Clients and Managing California-Based Employees

26.    Likewise, since July of 2011, Plaintiff DUFFY's role at FTI has expanded significantly and his work in California and responsibility for work being performed in California has increased substantially.  As an FTI employee, DUFFY spent time working in California and, while outside the state, working on behalf of California clients.  Moreover, in his role as Global Leader of the Corporate Finance & Restructuring Segment, he regularly solicited business from California-based companies on behalf of Defendant FTI, resulting in millions of dollars of revenue and profit generated for

1    Defendant FTI.  By virtue of his position as Co-Global Leader of the Corporate Finance

2    & Restructuring Segment from 2011 through 2014 and Global Leader of the Corporate

3    Finance & Restructuring Segment since August of 2014, Plaintiff DUFFY also

4    supervised at least 30 California-based FTI employees in the segment and employees

5    based in other states but performing work for California-based clients.

### 3. Plaintiff Fuhr's Significant Work for California-Based Clients and Managing California-Based Employees

8        27.    The growth in Plaintiff FUHR's work has paralleled that of Plaintiffs

9    DUFFY and COULOMBE, also resulting in substantial California-based work. In 2015,

10   Plaintiff FUHR expanded his group to California, where several employees reported

11   directly to him and worked for California clients.  Plaintiff FUHR has worked for

12   multiple clients based in California, and other non-California clients whose operational

13   and financial offices are located in the State.

### C. The Events Precipitating the Individual Plaintiffs' Departure from FTI

15       28.    Beginning in 2012, Plaintiffs COULOMBE and DUFFY identified an

16   opportunity in the marketplace to offer performance improvement services for retailers,

17   expanding upon existing services to retailers.  They hired a consultant to help formalize a

18   business plan and presented the idea to FTI's Industry Leader for support, which came in

19   2012. In early 2013, Plaintiff COULOMBE assumed responsibilities as the Leader of the

20   Retail subgroup, an industry vertical within the Corporate Finance & Restructuring

21   Segment which previously had been led by Plaintiff DUFFY.

22       29.    Plaintiff COULOMBE also assumed many of the responsibilities of the

23   position of Leader of the Northeast Region in July 2011, upon DUFFY's promotion to

24   Co-Global Leader of the Corporate Finance & Restructuring Segment.

25       30.    In January of 2004, Plaintiff DUFFY was promoted to Leader of the

26   Northeast Region and he became responsible for managing all aspects of FTI's Boston

27   office, including hiring, marketing, and growth strategy.  In July 2011, he was then

28   promoted to Co-Global Leader of the Corporate Finance & Restructuring Segment and

1  became responsible, together with the other Co-Global Leader, for the entire Corporate
2  Finance & Restructuring Segment globally.  He was also appointed to the Executive
3  Committee.  In August of 2014, Plaintiff DUFFY became responsible for the entire
4  Corporate Finance & Restructuring Segment globally.  Throughout these formal changes
5  in Plaintiff DUFFY's role and responsibilities, his salary remained substantially the same
6  since 2006, and was not increased at all in connection with his assuming the Co-Global
7  Leadership role in 2011 or Global Leadership role in 2014 despite his increased
8  responsibilities and significant practice growth.

9        31.    In 2010, Plaintiff FUHR created the Office of the CFO subgroup, a
10  consulting division part of the Corporate Finance & Restructuring Segment at FTI that
11  works directly with chief financial officers.  Plaintiff FUHR served as the Leader of that
12  subgroup until his resignation from FTI.   FUHR was personally responsible for
13  marketing, hiring, and growing the group, which has more than 50 employees across
14  several states.

15        32.    Since Plaintiff DUFFY assumed sole responsibility as Global Leader of
16  the Finance and Restructuring Segment in 2014, the Corporate Finance & Restructuring
17  practice has experienced tremendous growth.   On multiple occasions, Plaintiff DUFFY
18  has met with senior leadership at FTI to voice concerns that neither his compensation nor
19  that of key individuals within the Corporate Finance & Restructuring practices was
20  adequate.  For instance, in September 2014, December 2014 and throughout 2015, after
21  being promoted to Global Leader of the Corporate Finance & Restructuring Segment,
22  Plaintiff DUFFY met with FTI's Chief Executive Officer, Steven Gunby, and requested
23  an increase in his compensation to reflect the value he brought to FTI.  Mr. Gunby was
24  unwilling to agree to a compensation structure with Plaintiff DUFFY.

25        33.    Then, in 2014 Defendant FTI created a new incentive plan called the Key
26  Senior Managing Director Incentive Plan  (the "KSIP Plan"), that purportedly was
27  designed to incent, reward, and retain the highest performing Senior Managing Directors
28  ("SMDs") at FTI with a track record of success.  To obtain the benefits under the KSIP

1    Plan, a participant was required to enter into a new employment agreement that included

2    a liquidated damages provision that required employees who sought to leave FTI after

3    entering the KSIP Plan to pay a substantial sum for the privilege of pursuing their career

4    elsewhere.

5        34.    Plaintiffs COULOMBE and FUHR, who were invited to participate in the

6    KSIP Plan, found the provisions of the new employment agreement they would be

7    required to sign to be wholly inequitable, punitive in nature, and counterproductive to

8    attracting talented individuals to serve in the Corporate Finance & Restructuring practice.

9    Because of the terms of the new employment agreement they would need to sign,

10    Plaintiffs COULOMBE and FUHR declined to participate in the new KSIP Plan.

11        35.    Defendant FTI, by and through CEO Gunby and Chief Human Resources

12    Officer ("CHRO") Holly Paul, met with Plaintiff FUHR to try to obtain his agreement to

13    participate in the Plan notwithstanding his objections to the punitive nature of the terms

14    and conditions of the newly required employment agreement.

15        36.    In late 2014 and early 2015, CEO Gunby proposed a new compensation

16    structure for Segment Leaders (those senior employees who, like Plaintiff DUFFY, were

17    responsible for one of FTI's core business segments) who were members of FTI's

18    Executive Committee ("ExCo") which included Plaintiff DUFFY along with other

19    Segment Leaders who were also direct reports to CEO Gunby. This compensation

20    structure generally included reductions in fixed base salary for Segment Leaders like and

21    including Plaintiff DUFFY, while providing additional variable compensation

22    opportunities. In January 2016 and again in February 2016, CEO Gunby told Plaintiff

23    DUFFY that DUFFY would be removed from his position as Global Leader of Corporate

24    Finance & Restructuring Segment if he did not sign onto the new compensation structure

25    proposed for Segment Leaders who participated on ExCo like himself. For Plaintiff

26    DUFFY, this new compensation structure would have resulted in a reduction of 53%

27    from his existing fixed base salary. When Plaintiff DUFFY refused to agree to the

28    proposed ExCo compensation structure resulting in his fixed base salary being cut by

VERIFIED COMPLAINT                                                       9

1  more than half, CEO Gunby began excluding DUFFY from Executive Committee

2  meetings. Upon information and belief, in March 2016, Defendant FTI, by and through

3  CEO Gunby, initiated a transition plan to remove Plaintiff DUFFY from his position.

4       37.    Under pressure to agree to unfair, punitive, or unacceptable compensation

5  structures and/or employment agreements, Plaintiffs COULOMBE, DUFFY and FUHR

6  were left with no option but to pursue their careers and livelihood with another employer.

7  On April 8, 2016, they tendered their resignations to CEO Gunby. At the same time, the

8  Individual Plaintiffs indicated their willingness to continue working at FTI until the end

9  of the 45-day notice period set forth in their employment agreements.

10       38.    Plaintiff BERKELEY extended offers to Plaintiffs COULOMBE, DUFFY

11  and FUHR to work for BERKELEY in California when their employment at FTI

12  terminated. In anticipation of living and working in California, Plaintiffs COULOMBE,

13  DUFFY and FUHR have commenced searches for housing in California. Each of the

14  Individual Plaintiffs intends to move to California as soon as practicable.

15       39.    Defendant FTI has appointed new leaders to head the Individual Plaintiffs'

16  former practice groups.

17  **D. FTI's Repeated Attempts to Enforce Non-Competition Provisions**

18       40.    FTI has repeatedly sought to limit competition by attempting to limit its

19  employees' professional options and opportunities should they choose to leave FTI.

20       41.    Although not consistently, Defendant FTI has repeatedly sought to enforce

21  its non-competition provisions through threats and lawsuits so as to prevent talented

22  employees from leaving to further their careers.

23       42.    In addition, here, FTI has expressly threatened to file litigation to try to

24  enforce the non-competition provision in its employment agreements, should one of the

25  Individual Plaintiffs attempt to compete with FTI. In their efforts to compel employees

26  to enter into to the more restrictive employment agreements in connection with

27  participation in the KSIP Plan, CEO Gunby and CHRO Paul have repeatedly told

28  employees that they are already subject to a one-year non-compete, effectively messaging

1    that if the employees want to continue to work in their industry, they have no choice but

2    to stay. CHRO Paul even stated that the employees' only options in the industry were to

3    stay at FTI, or to be precluded from working in their chosen profession for a year. She

4    has consistently stated that FTI will seek to enforce the non-competition provisions of the

5    employment agreements.

6         43.    In light of FTI's threats, along with its past practice and history of

7    attempting to enforce the non-competition provision in its employment agreements, there

8    exists an actual, present and justiciable controversy between FTI and Plaintiffs

9    concerning the enforceability of the non-competition provision in the employment

10   agreements.

11   **E. The Non-Competes Have Harmed and Will Continue to Harm Plaintiffs**

12        44.    The non-competition provisions have already caused the Individual

13   Plaintiffs economic harm. For years, the Individual Plaintiffs have sought to increase

14   their compensation from FTI to reflect the profits and value that they and their practices

15   brought to FTI. Time and again, FTI failed to implement a compensation program or to

16   agree on a compensation structure to fairly compensate the Individual Plaintiffs for their

17   contributions, apparently assuming that the non-competition provisions in the Individual

18   Plaintiffs' Employment Agreements would deter them from resigning and significantly

19   reduce their value to prospective employers. This has caused losses to the Individual

20   Plaintiffs of hundreds of thousands, if not millions, of dollars.

21        45.    The harm Plaintiffs are suffering continues to this day and will continue

22   throughout the term of the non-competition provision if the unlawful restriction is not

23   invalidated. The Individual Plaintiffs are still FTI employees and will be purportedly

24   bound by the non-competition provisions until May 23, 2017 if those provisions are not

25   held to be unenforceable or enforcement is not otherwise enjoined.

26        46.    Moreover, if the Individual Plaintiffs were unable to pursue their careers

27   for Plaintiff BERKELEY, they would face irreparable financial harm. Competition in the

28   consulting industry, and particularly the restructuring industry, is fierce. If Plaintiffs

VERIFIED COMPLAINT                                                                              11

1    COULOMBE, DUFFY and FUHR were precluded from working in their chosen

2    profession for an entire year, their ability to compete in their industries would be

3    significantly impacted.   Their network of relationships with executives, businesses,

4    bankers, private equity firms, hedge funds and law firms, all of whom influence the

5    decision over who is retained to work on engagements, would be significantly depleted.

6    As a result, the Individual Plaintiffs' ability to maintain and grow their reputation and

7    goodwill within their industries would be substantially impaired.   The Individual

8    Plaintiffs' long-term professional prospects and livelihood would thus be irreparably

9    harmed.

10          47.    Further, clients with whom the Individual Plaintiffs worked are also in a

11   position to be harmed to the extent that FTI attempts to enforce its unlawful non-

12   competition provisions.   These clients may be reluctant to seek out the services of the

13   Individual Plaintiffs if they are fearful that they may be drawn into litigation arising from

14   the unlawful non-competition provisions.    Public policy would be enhanced, and the

15   public interest would be served, if the non-compete provisions were invalidated thereby

16   enabling clients to retain their preferred service providers.

17          48.    Likewise, Plaintiff BERKELEY, which is growing and expanding its

18   business in California, has and will continue to face economic harm from FTI's unlawful

19   use of invalid and unenforceable non-competition provisions.   Such provisions have

20   interfered with BERKELEY's competitive recruitment of talented individuals interested

21   in working for BERKELEY and have made it more expensive for BERKELEY to recruit

22   them.  This harm will continue as a result of FTI's threat of litigation to enforce these

23   non-competition provisions.

24          49.    Plaintiffs COULOMBE, DUFFY, FUHR and BERKELEY seek this

25   Court's injunctive relief prohibiting Defendant FTI from enforcing the illegal non-

26   competition provisions as well as a declaration that the non-competition provision in each

27   Individual Plaintiff's Employment Agreement is void and unenforceable.

28

---

**VERIFIED COMPLAINT**                                                                12

# FIRST CAUSE OF ACTION

## (Violation of Business & Professions Code § 17200 et seq.)
## (By all Plaintiffs against all Defendants)

50.     Plaintiffs COULOMBE, DUFFY, FUHR and BERKELEY hereby incorporate paragraphs 1 through 49 herein and reallege them as though fully set forth herein.

51.     The non-competition provisions in the Employment Agreements are void pursuant to California Business & Professions Code Section 16600. California has a strong public policy against contracts that prohibit employment in California regardless of where the parties exchanged promises. By including the non-competition provisions in the Employment Agreements while the Individual Plaintiffs performed and are performing work in California, including for California-based clients, and/or managing that work as well as numerous California-based employees, Defendant FTI has engaged and is engaging in unlawful and unfair business acts and practices in violation of California's Unfair Business Practices Act set forth in California Business & Professions Code Sections 17200 et seq.

52.     Defendant FTI's unlawful and unfair business acts and practices are ongoing and will continue until at least May 23, 2017, and likely thereafter.

53.     Defendant FTI's unlawful and unfair business acts and practices have injured Plaintiffs and caused and will continue to cause Plaintiffs to suffer irreparable harm, including economic harm.

54.     Plaintiffs do not have a plain, speedy, and adequate remedy at law.

55.     Plaintiffs COULOMBE, DUFFY, FUHR and BERKELEY seek a judgment from this Court enjoining Defendant FTI from using, relying upon, or attempting to enforce the non-competition provisions in the Employment Agreements to restrain Plaintiffs COULOMBE, DUFFY and FUHR from providing their services to Plaintiff BERKELEY.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment
### Pursuant to Cal. Code Civ. Pro. § 1060)
### (By all Plaintiffs against all Defendants)

56.     Plaintiffs COULOMBE, DUFFY, FUHR and BERKELEY hereby incorporate paragraphs 1 through 55 herein and reallege them as though fully set forth herein.

57.     Defendant FTI has engaged in a repeated practice of threatening to litigate and actually litigating to enforce the non-competition provisions in its employment agreements, including provisions that are identical or substantially similar to those found in the Employment Agreements.  In addition, Defendant FTI has directly threatened legal action here.  As a result, Plaintiffs have every reason to believe that Defendant FTI will attempt to enforce the non-competition provisions in the Employment Agreements through litigation.

58.     An actual, present and justiciable controversy has therefore arisen between Plaintiffs COULOMBE, DUFFY, FUHR, and BERKELEY and Defendant FTI concerning the enforceability of the non-competition provision in the Employment Agreements.

59.     Plaintiffs COULOMBE, DUFFY, FUHR, and BERKELEY seek a declaratory judgment from this Court that the non-competition provisions in the Employment Agreements that Defendant FTI relies on are unenforceable in California pursuant to Business and Professions Code Section 16600, or unenforceable under the law of any other state in the unlikely even that the Court determines that some other state's law applies.

60.     Furthermore, Plaintiffs COULOMBE, DUFFY, FUHR, and BERKELEY seek a declaratory judgment from this Court that Defendant FTI's use of the non-competition provisions in the Employment Agreements constitutes unlawful and unfair

1    business acts and practices in violation of California's Unfair Business Practices Act set

2    forth in California Business & Professions Code Sections 17200 et seq.

3    **<u>PRAYER FOR RELIEF</u>**

4          WHEREFORE, Plaintiffs COULOMBE, DUFFY, FUHR, and BERKELEY pray

5    for relief against Defendant FTI as follows:

6          (1)     For a judgment from this Court enjoining Defendant FTI from using,

7    relying upon, or attempting to enforce the non-competition provisions in the Employment

8    Agreements to restrain Plaintiffs COULOMBE, DUFFY and FUHR from providing their

9    services to Plaintiff BERKELEY;

10          (2)     For a declaratory judgment declaring that the non-competition provisions

11    in the Employment Agreements are void and/or unenforceable;

12          (3)     For a declaratory judgment declaring that Defendant FTI's use of and

13    attempt to enforce the non-competition provision in the Employment Agreements to

14    restrain Plaintiffs COULOMBE, DUFFY and FUHR from providing certain services in

15    California constitutes unlawful and unfair competition in violation of California's Unfair

16    Business Practices Act set forth in California Business & Professions Code Sections

17    17200 et seq.;

18          (4)     For an award of the Plaintiffs' costs of this suit, and reasonable attorneys'

19    fees and litigation expenses; and

20          (5)     For such other, further or different relief for Plaintiffs COULOMBE,

21    DUFFY, FUHR, and BERKELEY as the Court may deem proper.

22

23

24

25

26

27

28

---

VERIFIED COMPLAINT                                            **15**

1

2

3    May 13, 2016

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By _____
     Jeffrey F. Webb

ROPES & GRAY LLP

Attorneys for Plaintiffs
STEPHEN L. COULOMBE,
ROBERT J. DUFFY,
ELLIOT A. FUHR,
BERKELEY RESEARCH GROUP, LLC

---

**VERIFIED COMPLAINT**                                                   **16**

1     **<u>VERIFICATION</u>**

2     I, ROBERT J. DUFFY, hereby declare as follows:

3        I am one of the Plaintiffs in the above-captioned matter. I have read the foregoing

4     Verified Complaint and know the contents thereof. The allegations set forth in the

5     Verified Complaint directly pertaining to me are true of my own knowledge. As to all

6     other matters, I believe such allegations to be true based upon information and belief.

7        I declare under penalty of perjury under the laws of the State of California that the

8     foregoing is true and correct and this Verification was executed on May 13, 2016.

9

10

11                                     Robert J. Duffy

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, STEPHEN L. COULOMBE hereby declare as follows:

     I am one of the Plaintiffs in the above-captioned matter.  I have read the foregoing Verified Complaint and know the contents thereof.  The allegations set forth in the Verified Complaint directly pertaining to me are true of my own knowledge.  As to all other matters, I believe such allegations to be true based upon information and belief.

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this Verification was executed on May 13, 2016.

Stephen L. Coulombe

<u>**VERIFICATION**</u>

I, ELLIOT A. FUHR, hereby declare as follows:

    I am one of the Plaintiffs in the above-captioned matter.  I have read the foregoing Verified Complaint and know the contents thereof.  The allegations set forth in the Verified Complaint directly pertaining to me are true of my own knowledge.  As to all other matters, I believe such allegations to be true based upon information and belief.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this Verification was executed on May 13, 2016.

Elliot A. Fuhr

**VERIFICATION**

I, John ("Tri") MacDonald, hereby declare as follows:

    I am President of Berkeley Research Group, LLC, one of the Plaintiffs in the above-captioned matter and am authorized to make this verification for and on its behalf. I have read the foregoing Verified Complaint and know the contents thereof. The allegations set forth in the Verified Complaint directly pertaining to BRG are true of my own knowledge. As to all other matters, I believe such allegations to be true based upon information and belief.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this Verification was executed on May 13, 2016.

                                          John ("Tri") MacDonald

1
2
3
4
5                                              **Exhibit A**
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VERIFIED COMPLAINT**

# EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT ("Agreement") made as of the date the parties have signed this Agreement below, by and between FTI, LLC, a Maryland limited liability company ("FTI, LLC"), FTI Consulting, Inc., a Maryland corporation ("FTI Consulting"), and the individual named on Schedule 1 ("Employee"). FTI, LLC, FTI Consulting, and all of their respective subsidiaries, affiliates and entities, are hereinafter referred to collectively as the "Company."

1.    Employment Agreement. FTI, LLC will employ Employee and Employee accepts such employment upon the terms and conditions set forth in this Agreement.

2.    Term of Employment. Employee's employment under this Agreement will be for a term of five (5) years from the Effective Date, and the term of this Agreement will automatically extend for an additional year from year to year, unless either party provides written notice of non-renewal to the other party at least ninety (90) days prior to the date of the expiration of the initial term or any extended term of this Agreement, or unless this Agreement is otherwise terminated pursuant to the provisions of Section 9 of this Agreement. The effective date of this Agreement is the date of execution of this Agreement ("Effective Date").

3.    Position and Duties. Employee will be employed as a senior managing director with such duties and responsibilities that are consistent with that position as may from time to time be assigned to Employee by the head of the Corporate Finance practice or his or her designee, and will have such authority as may be reasonably necessary for Employee to carry out his or her duties and responsibilities. Employee will undertake such travel within or without the United States necessary to the performance of Employee's duties and responsibilities.

Employee will work full-time and devote all of Employee's business time, attention, and energies to, on behalf of, and for the benefit of the Company. Employee will not, without the written consent of the Company: (i) render service to others for compensation, or (ii) serve on any board or governing body of another for profit entity. Employee will not engage in any activity which conflicts or interferes with the performance of Employee's duties and responsibilities hereunder. Employee may engage in personal, charitable, and professional activities, (i) subject to compliance with the Company's normal conflicts procedures, and (ii) provided such activities do not conflict or materially interfere with the ability of Employee to perform the duties and responsibilities hereunder. If an outside activity subsequently creates a conflict with the Company's business or prospective business, Employee agrees to cease engaging in such activity at such time.

Employee will observe and adhere to all applicable written Company policies and procedures adopted from time to time, including, without limitation, the Company's Policy on Ethics and Business Conduct, Policy on Conflicts of Interest, Acceptable Use Policy and Policy on Inside Information and Insider Trading, such as they now exist or hereafter are supplemented, amended, modified or restated.

4.   Salary and Compensation.

(a)   Salary.   Employee's annual rate of salary ("Salary") is set forth on Schedule 1. The Company agrees to annually evaluate Employee's performance and Salary. The Company, in its sole discretion, may increase or decrease Employee's Salary at any time, provided, however, that Employee's Salary may not be decreased to less than the Salary listed on Schedule 1. Employee's Salary will be paid in accordance with the Company's customary payroll practices (including, but not limited, to practices regarding timing and withholding).

(b)   FTI Senior Managing Director Incentive Compensation Program. Employee will be eligible to participate in all or part of the FTI Consulting, Inc. Senior Managing Director Incentive Compensation Program (the "IC Program"), with the current IC Program document attached as Exhibit H. Those portions of the IC Program in which Employee is currently eligible to participate are listed in Schedule 1. Employee's participation in any portion of the IC Program will be subject to the terms of the applicable IC Program documents, including, but not limited to, any applicable equity-based incentive compensation plan or deferred compensation plan, or any equity award agreements, and the Company's generally applied policies. The Company, in its sole discretion, may terminate or from time to time may modify the IC Program; provided, however, (i) such action may not adversely affect awards already issued to Employee, and (ii) if any such action would diminish Employee's overall economic opportunity to earn incentive compensation under the current IC Program, then the Company will provide other incentive compensation opportunities to Employee under the IC Program or otherwise in order to avoid a diminution of any such overall economic opportunity. There is no guarantee as to the amount, if any, that may be earned by Employee under the IC Program or any other incentive compensation program(s) maintained by the Company.

(c)   Bonus Plan(s).   Employee may participate in any bonus plan(s) offered by FTI from time to time in which Employee is eligible to participate pursuant to the terms of the bonus plan(s) (the "Bonus Plans"). The terms of the current Corporate Finance EBITDA, Hours and Success Fee Bonus Plans (the "Current Bonus Plans") in which Employee is currently eligible to participate are attached as Exhibits A, B and C, respectively. As of the Effective Date, the Company acknowledges that it has no present plan or intention to modify or terminate any of the Current Bonus Plans. The Company, in its sole discretion, may terminate or from time to time may modify any particular Bonus Plan(s), provided, however, (i) such action may not adversely affect bonuses already awarded to Employee, (ii) if any such action would diminish Employee's overall economic opportunity to earn bonuses under the Current Bonus Plans, then the Company will provide other bonus opportunities to Employee under the Current Bonus Plans or otherwise in order to avoid a diminution of any such overall economic opportunity, and (iii) in addition to the Corporate Finance Hours and Success Fee Bonus Plans (or their successor plans), for each calendar year, the Company will provide a bonus pool for the Corporate Finance/Restructuring Practice Group (comprised at minimum of those practice units residing in the group on January 1, 2006, but not (y) any practice group acquired after January 1, 2006, within the U.S. until such practice unit surpasses the applicable hurdle rate set by the Company; or (z) any practice unit acquired after January 1, 2006, outside the U.S.) (the "CFPG") in an amount that is at least equal to the amount determined by applying the current EBITDA Bonus Pool formula (set forth in Paragraph 4(a) of Exhibit A) to the CFPG Adjusted EBITDA

2

for such calendar year (determined in accordance with Section 4(b) of Exhibit A as currently in effect), which bonus pool will be administered in a manner consistent with Exhibit A (as currently in effect). There is no guarantee, however, as to the amount, if any, that Employee may earn under any Bonus Plan(s).

(d) Initial Loan(s). On the Effective Date, Employee will be eligible to receive a loan ("Initial Loan") from the Company, in the amount listed on Schedule 1. In order to receive this Initial Loan, Employee will be required to execute a promissory note and other applicable loan documents deemed necessary by the Company ("Loan Agreements"), which will be provided to Employee. The Loan Agreements will be in the form and substance as set forth in Exhibit D-1 to this Agreement. If Employee does not execute the Loan Agreements on the Effective Date, Employee will cease to be eligible to receive the Initial Loan.

(e) Initial Stock Option Award. On the Effective Date, Employee will receive a stock option award ("Initial Stock Option Award") from the Company for the number of Company shares listed on Schedule 1. The Initial Stock Option Award will be in the form and substance as set forth in Exhibit E-1 to this Agreement.

(f) Initial Restricted Stock Award. On the Effective Date, Employee will receive a restricted stock award ("Initial Restricted Stock Award") from the Company for the number of restricted stock shares listed on Schedule 1. The Initial Restricted Stock Award will be in the form and substance as set forth in Exhibit F-1 to this Agreement.

(g) Additional Loan Amounts, Stock Option Awards and Restricted Stock Awards. During the term of this Employment Agreement, the Company, in its sole discretion, may increase the amount of the Loan Employee is eligible for under Section 4(d) ("Additional Loan"), or grant Employee additional stock option awards ("Additional Stock Option Awards") or additional restricted stock awards ("Additional Restricted Stock Awards"). In order to receive an Additional Loan (if any), Employee will be required to execute any Loan Agreements deemed necessary by the Company, which will be provided to Employee at the time of such Additional Loan. Such Additional Loan Agreements will be in the form and substance deemed necessary by the Company and will substantially reflect the features set forth in Exhibit D-2 to this Agreement applicable to such Additional Loan. Additional Stock Option Awards (if any) or Additional Restricted Stock Awards (if any) will be in the form and substance deemed necessary by the Company and will substantially reflect the features set forth in Exhibit E-2 and Exhibit F-2, respectively, to this Agreement applicable to such Additional Stock Option Awards or Additional Restricted Stock Awards. For purposes of this Agreement, the term "Equity Awards" shall include the (1) Initial Stock Option Award, (2) Initial Restricted Stock Award, (3) Additional Stock Option Awards (if any), (4) Additional Restricted Stock Awards (if any), and (5) stock option awards, restricted stock awards and cash awards made in lieu of stock option or restricted stock awards (if any), made in conjunction with the IC Program (such awards under the IC Program referred to herein as the "IC Program Awards").

(h) Interpretation of Terms. In the event that there is a conflict between the terms of the Bonus Plans, Equity Awards or Loan Agreements and the terms outlined herein or in the Exhibits hereto, the terms of the Bonus Plans, Equity Awards and Loan Agreements,

3

including any terms incorporated by reference into any such document from this Agreement, shall govern.

5.    Employee Benefit Programs and Perquisites.

    (a)    General.   Employee will be eligible to participate in such qualified and nonqualified employee pension plans, group health, long term disability and group life insurance plans generally maintained or provided by the Company from time to time to or for the benefit of its employees generally ("Benefit Plans"), at a level commensurate with Employee's position and Company policy regarding other similarly situated Company employees, provided that Employee meets the prerequisites and eligibility factors established by the Company for participation in the Benefit Plans. Employee will also be eligible to participate in any other welfare and fringe benefit plans, arrangements, programs and perquisites, including equity-based incentive compensation plans or deferred compensation plans ("Fringe Benefit Plans"), provided that Employee meets the prerequisites and eligibility factors established by the Company for participation in the Fringe Benefit Plans. For purposes of eligibility and participation in any Benefit Plan or Fringe Benefit Plan, Employee will have the years of seniority listed in Schedule 1, if applicable to such Benefit Plan or Fringe Benefit Plan. Employee's participation in any Benefit Plans or Fringe Benefit Plans will be subject to the terms of the applicable plan documents and the Company's generally applied policies. The Company in its discretion may from time to time adopt, modify, interpret, or discontinue such plans or policies.

    (b)    Paid Time Off.   Employee will be eligible to take (i) the number of weeks of paid time off ("PTO") set forth on Schedule 1 for each calendar year (pro-rated for partial calendar years) subject to the Company's policies on use and retention of such PTO in effect from time to time, plus (ii) any paid Company holidays.

    (c)    Reimbursement of Business Expenses.   Employee is authorized to incur reasonable expenses in carrying out Employee's duties and responsibilities under this Agreement, and the Company will promptly pay or reimburse Employee for all such expenses that are so incurred upon presentation of appropriate vouchers or receipts, subject to the Company's expense reimbursement policies in effect from time to time with respect to employees of the Company.

6.    No Other Employment Restrictions.   Employee represents to the Company that Employee is not subject to any agreement, commitment, or policy of any third party that would prevent Employee from entering into or performing or continuing to perform the duties of Employee's employment under this Agreement. Employee will not enter into any agreement or commitment or agree to any policy that would prevent or hinder the performance of Employee's duties or obligations under this Agreement. Employee will not use in working for the Company and will not disclose to the Company any trade secrets or other information Employee does not have the right to use or disclose and that the Company is not free to use without liability of any kind.

7.    No Payments to Governmental Officials.   Employee will not knowingly pay or authorize payment of any remuneration to or on behalf of any governmental official which would

4

constitute a violation of applicable law. The Company will neither request nor require Employee to offer to make or make a payment of any remuneration to or on behalf of any governmental official other than those required or expressly permitted by applicable law.

8.    Professional Licenses. If Employee's duties or responsibilities hereunder require Employee to maintain licenses, certifications or memberships, either now or at any time in the future, in order to perform Employee's duties or responsibilities hereunder, or to remain in compliance with the law or the Company's policies and procedures related to professional licensure, Employee shall procure and maintain all such licenses, certifications or memberships, the costs of which, if incurred by Employee, will be reimbursed by the Company. If applicable, such licenses, certification or memberships encompassed by this Section 8 are listed in Schedule 1.

9.    Termination of Employment.

(a)    Resignation. Employee may resign his or her employment under this Agreement at any time upon at least 45 days prior written notice to the Company. The Company, at its sole discretion, may relieve Employee of his or her active duties and may require Employee to use any accrued and unused paid time off, including vacation, during the notice period. The Company may also waive such notice, and/or set an earlier termination date upon receipt of such notice, in which event Employee's employment will terminate on the earlier termination date, and no pay in lieu of notice will be due.

(b)    Termination by the Company for Cause. The Company may terminate Employee's employment for "Cause" if Employee:

(i) is convicted of or pleads nolo contendre to a felony;

(ii) commits fraud or a material act or omission involving dishonesty with respect to the Company or any of its respective employees, customers or affiliates, as reasonably determined by the Company;

(iii) willfully fails or refuses to carry out the material responsibilities of Employee's employment by the Company, as reasonably determined by the Company;

(iv) engages in gross negligence, willful misconduct, or a pattern of behavior which has had or is reasonably likely to have a significant adverse effect on the Company, as reasonably determined by the Company;

(v) willfully engages in any act or omission which is in material violation of the FTI Consulting, Inc. Policy on Ethics and Business Conduct, Policy on Conflicts of Interest, Acceptable Use Policy or Policy on Inside Information and Insider Trading, such as they now exist or hereafter are supplemented, amended, modified or restated, including but not limited to engaging in insider transactions, disclosing a proposed or pending business transaction, receiving preferential treatment or gifts, failing to disclose conflicts of interest, disseminating inside information, and/or taking advantage of corporate opportunities for personal benefit; or

5

(vi) commits a material breach of Employee's material obligations under this Agreement, including but not limited to Sections 7 or 8 above, as reasonably determined by the Company.

The Company may terminate Employee's employment under this Agreement for Cause (as defined in subparagraphs (i) through (vi) above) at any time, provided, however, that if the act or omission giving rise to the termination for Cause is curable by Employee, the Company will provide 30 days written notice to Employee of its intent to terminate Employee for Cause, with an explanation of the reason(s) for the termination for Cause, and if Employee cures the act or omission within the 30 day notice period, the Company will rescind the notice of termination and Employee's employment will not be terminated for Cause at the end of the 30 day notice period. Notwithstanding the foregoing, if Employee has previously been afforded the opportunity to cure and successfully cured under this provision, the Company will have no obligation to provide Employee with notice and an opportunity to cure prior to a termination for Cause. Unless Employee receives 30 days notice and an opportunity to cure under this Section, Employee's termination for Cause will be effective immediately upon the Company mailing or transmitting written notice of such termination to Employee.

(c)     Termination by the Company Without Cause. The Company may terminate Employee's employment under this Agreement without Cause at any time upon 45 days prior written notice to Employee. The Company, at its sole discretion, may relieve Employee of his or her active duties and require Employee to use any accrued and unused paid time off, including vacation, during the notice period. The Company may also provide 45 days pay in lieu of notice. Employee's termination without Cause will be effective on the date of termination specified by the Company.

(d)     Termination Due to Disability. If Employee becomes "Disabled" (as defined below), the Company may terminate Employee's employment. For the purposes hereof, Employee and the Company agree that Employee will be considered "Disabled" if Employee is unable to substantially perform the customary duties and responsibilities of Employee's employment for 180 consecutive calendar days or 180 or more calendar days during any 365 calendar day period by reason of a physical or mental incapacity. Employee agrees that if Employee becomes "Disabled" under the definition of this Section 9(d), Employee will be unable to perform the essential functions of Employee's position and that there would be no reasonable accommodation which would not constitute an undue hardship to the Company. Therefore, as Employee would not be qualified for Employee's position, the Company would have the right to terminate Employee's employment under this Section 9(d). Employee's termination due to Disability will be effective immediately upon the Company mailing or transmitting written notice of such termination to Employee.

(e)     Termination Due to Death. If Employee dies during the term of this Agreement, this Agreement will terminate on the date of Employee's death.

(f)     Termination Due to Non-Renewal by Employee or the Company. Either Employee or the Company may terminate this Agreement by providing written notice of intent not to renew this Agreement, as described in Section 2 of this Agreement. Employee's

6

termination due to non-renewal will be effective at the end of the applicable initial or extended term.

(g)     Termination by Employee for Good Reason.  Employee may terminate employment for "Good Reason" if, without Employee's prior consent, the Company: (1) reduces Employee's Salary below that listed on Schedule 1; (2) reduces Employee's compensation opportunities contrary to Sections 4(a)-(f) of this Agreement; (3) materially breaches the first paragraph of Section 3 of this Agreement; (4) relocates Employee to an office more than fifty (50) miles from Employee's office on the Effective Date of this Agreement; (5) fails to obtain and deliver to Employee a written agreement from an assignee or successor of the Company for the assumption of the obligations of the Company under this Agreement; or (6) commits a material breach of the Company's material obligations under this Agreement. Before terminating employment for Good Reason, Employee must specify in writing to the Company the nature of the act or omission that Employee deems to constitute Good Reason and provide Company 30 days after receipt of such notice to correct the situation (and thus prevent Employee's termination for Good Reason).

(h)     Termination by Employee due to Retirement.  Employee may elect to voluntarily terminate employment with the Company due to "Retirement" if: (1) Employee has at least 65 "age plus actual years of FTI employment as a senior managing director" points at termination, where "age plus actual years of FTI employment as a senior managing director" points are determined by adding (i) the participant's age (determined in whole years, with an applicable fractional credit of a year for any additional whole months), plus (ii) the participant's actual years of employment as a senior managing director with the Company (or, if applicable, a successor entity that assumes this Agreement) at termination, provided that prior years of employment with any entity acquired by the Company shall not count as actual years of employment as a senior managing director for Retirement eligibility purposes (actual years of employment as a senior managing director shall be determined in whole years, with an applicable fractional credit of a year for any additional whole months); and (2) Employee has completed six years of consecutive Service (as defined below).  If Employee meets the above listed criteria for Retirement, Employee may resign his or her employment due to Retirement upon at least 45 days prior written notice to the Company.  Retirement status is contingent on Employee's continued compliance with the non-solicitation and non-competition provisions of the Agreement throughout Retirement.

(i)     Service.  "Service" means commencing on the Effective Date, the completion of any combination of consecutive (i) employment hereunder, and (ii) continued compliance with the non-solicitation and non-competition provisions of this Agreement during the Restricted Period (as defined in Section 18(a)), provided that such compliance period commences after five years of employment hereunder.

10.     Payments in the Event of Termination of Employment.

(a)     Termination of Employment by Resignation or Notice of Non-Renewal of the Agreement by Employee.  In the event of termination of Employee's employment with the Company due to resignation by Employee pursuant to Section 9(a), or due to notice of non-

7

renewal of the Agreement by Employee pursuant to Sections 2 and 9(f), the Company will pay to Employee: (i) the unpaid amount, if any, of Employee's Salary through the date of termination, (ii) the amount of any substantiated but previously unreimbursed business expenses incurred prior to the date of termination, and (iii) any additional payments, awards, or benefits, if any, which Employee is eligible to receive under the terms of any Benefit Plan or any Fringe Benefit Plan (collectively, "Accrued Compensation").

Employee will be eligible to exercise his or her rights to COBRA coverage for Employee, and, where applicable, Employee's spouse and eligible dependents, at Employee's expense, upon termination of Employee's employment.

In the event Employee terminates upon or after completion of five years of consecutive Service (as defined in Section 9(i)), executes on or about the date of termination a valid waiver and general release of any and all claims against the Company to the fullest extent permitted by law, in a form and manner set forth in Exhibit G, with such revisions reasonably determined by the Company to be necessary at the applicable time due to changes in applicable law and/or to conform the release to the applicable facts and circumstances ("Release"), and continues to comply with the non-solicitation and non-competition provisions of this Agreement through the applicable vesting, forgiveness or payment date, Employee will receive any additional payments, awards or benefits which Employee is eligible to receive under the IC Program, any Equity Award, any Bonus Plan(s), any Loan Agreements, any Additional Loan Agreements, any Benefit Plan, or any Fringe Benefit Plan, including:

(i) if Employee terminates upon or after completion of five years of consecutive Service, but prior to or coincident with the completion of six years of consecutive Service, 50% of the original principal amount and 100% of the outstanding accrued interest of the Initial Loan will be forgiven on the date Employee completes six years of consecutive Service (as defined in Section 9(i)),

(ii) if Employee terminates upon or after completion of five years of consecutive Service, but prior to or coincident with the completion of six years of consecutive Service, the applicable percentage (as provided under Exhibit D-2) of the original principal amount of the Additional Loans (if any) that would have been forgiven on the date Employee completes six years of consecutive Service had Employee continued employment until such date and 100% of any then outstanding accrued interest on such Additional Loan(s) shall be forgiven on the date Employee completes six years of consecutive Service,

(iii) if Employee terminates upon or after completion of five years of consecutive Service, but prior to or coincident with the completion of six years of consecutive Service, the portions of the Initial Stock Option Award, Initial Restricted Stock Award, Additional Stock Option Awards (if any), and Additional Restricted Stock Awards (if any) that would have vested during the Restricted Period had Employee

8

continued employment during such time shall vest and, as applicable, be payable, at the applicable vesting date.

(iv) if Employee terminates after completion of six years of consecutive Service, the portions of the Initial Stock Option Award, Initial Restricted Stock Award, Additional Stock Option Awards (if any), and Additional Restricted Stock Awards (if any) that would have vested during the Restricted Period had Employee continued employment during such time shall vest and, as applicable, be payable, upon the expiration of the Restricted Period.

(v) if Employee terminates upon or after completion of five years of consecutive Service, the IC Program Awards will continue to vest and, as applicable, be payable, as if Employee had continued employment, and

(vi) if Employee terminates upon or after completion of five years of consecutive Service, all options under an Equity Award already vested at termination will be exercisable for 90 days after the date of termination, and all options under an Equity Award that vest after termination will be exercisable for 90 days after the date of vesting.

Employee agrees to repay the then outstanding principal amount and accrued interest under the Initial Loan and any Additional Loans (each to the extent not forgiven in accordance with this Section 10(a) or not otherwise previously forgiven) within 10 days after the date of termination; provided, however, if Employee terminates upon or after completion of five years of consecutive Service, but prior to or coincident with the completion of six years of consecutive Service, such amounts with regard to the Initial Loan and any Additional Loans will be repaid within 10 days after the earlier of (i) the date Employee completes six years of consecutive Service or (ii) the date Employee ceases to comply with the non-solicitation or non-competition provisions of this Agreement.

(b)     Termination of Employment by the Company for Cause.  In the event of termination of Employee's employment with the Company due to the Company's termination of Employee for Cause pursuant to Section 9(b), the Company will pay to Employee the Accrued Compensation (as defined in Section 10(a)).  Employee agrees to repay the then outstanding principal amount and accrued interest under the Initial Loan and any Additional Loans (each to the extent not previously forgiven) within 10 days after the date of termination.

(c)     Termination of Employment by the Company Without Cause, Termination of Employment by Notice of Non-Renewal of the Agreement by the Company, or Termination of Employment by Employee for Good Reason.  In the event of termination of Employee's employment with the Company due to the Company's termination of Employee without Cause pursuant to Section 9(c), due to notice of non-renewal of the Agreement by the Company pursuant to Sections 2 and 9(f), or due to termination by Employee for Good Reason pursuant to Section 9(g), the Company will pay Employee (1) the Accrued Compensation (as defined in

9

Section 10(a)), (2) the bonus earned by Employee under the Corporate Finance EBITDA and Hours Bonus Plans (or their successor bonus plans, if any) for the year ending prior to or coincident with the termination of Employee's employment, to the extent not previously paid or provided for, and (3) payment of a pro rata bonus under the Corporate Finance EBITDA Bonus Plan for the year in which Employee's employment terminates, determined by multiplying Employee's bonus earned under the Corporate Finance EBITDA Bonus Plan for the year preceding the year in which Employee's employment is terminated by a fraction, the numerator of which is the number of days from the beginning of the calendar year in which Employee's termination occurs through the date of Employee's termination, and the denominator of which is 365 (the "Pro Rata Bonus"). The bonus payments (if any) provided for under the prior sentence will be payable in cash on the later of the termination date, or March 15th of the termination year, and such bonus payments will not be subject to any deferral under the IC Program and Employee will not receive any match awards under the IC Program as a result of such bonus payments.

If Employee continues to comply with the post employment obligations under this Agreement for the Restricted Period (as defined in Section 18(a)), and if Employee executes a Release (as defined in Section 10(a)) on or about the date of termination, Employee will receive: (1) continued payment of Salary for a 12 month salary continuation period based upon the greater of (i) Employee's Salary for the year in which Employee's employment is terminated, or (ii) Employee's average Salary for the three years (or all years if less than three) preceding the year in which such termination occurs (the "Salary Continuation Payments"); and (2) continued group health and group life insurance coverage for Employee and, where applicable, Employee's spouse and eligible dependents during the 12 month period following termination at the same benefit and contribution levels in effect from time to time with respect to active employees of the Company ("Benefit Continuation Coverage"). If and to the extent the group health coverage under the Benefit Continuation Coverage is not permitted by the applicable plan or law, Employee's COBRA coverage will begin immediately upon termination, and the Company will pay the premiums for group health coverage for Employee and, where applicable, Employee's spouse and eligible dependents under COBRA during the 12 month salary continuation period. If Employee is eligible for the group health coverage under the Benefit Continuation Coverage, the Benefit Continuation Coverage will not be considered COBRA continuation coverage, and Employee and, where applicable, Employee's spouse and eligible dependents, will be eligible to exercise his, her or their rights under COBRA, at his, her or their expense, upon the expiration of the Benefit Continuation Coverage period.

If Employee executes a Release (as defined in Section 10(a)) on or about the date of termination, and if Employee complies with the non-solicitation and non-competition provisions of this Agreement for the Restricted Period (as defined in Section 18(a)), then upon the expiration of the Restricted Period, Employee will receive any additional payments, awards or benefits which Employee is eligible to receive under the IC Program, any Equity Award, any Bonus Plan(s), any Loan Agreements, any Additional Loan Agreements, any Benefit Plan, or any Fringe Benefit Plan, including:

(i) all unvested Equity Awards will vest and, as applicable, be payable.

(ii) all deferred cash bonus payments awarded for service prior to January 1, 2006, if any, will be payable,

(iii) if Employee has not fulfilled six years of consecutive Service (as defined in Section 9(i)) prior to the expiration of the Restricted Period, 50% of the original principal amount of the Initial Loan and any Additional Loans, and 100% of the outstanding accrued interest of such loans, will be forgiven,

(iv) all options under an Equity Award already vested at termination will be exercisable for 90 days after the date of termination, and all options under an Equity Award that vest after termination will be exercisable for 90 days after the date of vesting,

(v) if Employee has fulfilled six years of consecutive Service (as defined in Section 9(i)) on the date of termination, 12.5% of the original principal amount and 100% of the outstanding accrued interest of the Initial Loan will be forgiven,

(vi) if Employee has fulfilled six years of consecutive Service (as defined in Section 9(i)) on the date of termination, the applicable percentage (as provided under Exhibit D-2) of the original principal amount of the Additional Loans (if any) that would have been forgiven during the Restricted Period had Employee continued employment during such time and 100% of any then outstanding accrued interest on such Additional Loan(s) will be forgiven, provided that such applicable percentage will be increased if necessary such that no less than 50% of the original principal amount shall have been forgiven throughout the term of the Additional Loans (if any),

(vii) if Employee terminates upon or after completion of five years of consecutive Service, but prior to the completion of six years of consecutive Service, and Employee fulfills six years of consecutive Service during the Restricted Period, 50% of the original principal amount of the Initial Loan and any Additional Loans, and 100% of the outstanding accrued interest of such loans, will be forgiven on the earlier date Employee completes six years of consecutive Service (and not upon the expiration of the Restricted Period), and

(viii) if Employee terminates upon or after completion of five years of consecutive Service, but prior to or coincident with the completion of six years of consecutive Service, the portions of the Equity Awards that would have vested during the Restricted Period had Employee continued employment during such time shall vest and, as applicable, be payable, at the earlier applicable vesting date (and not upon the expiration of the Restricted Period).

11

Employee agrees to repay the then outstanding principal amount and accrued interest under the Initial Loan and any Additional Loans (each to the extent not forgiven in accordance with this Section 10(c) or not otherwise previously forgiven) within 10 days after the earlier of (i) the expiration of the Restricted Period, or (ii) the date Employee ceases to comply with the non-solicitation or non-competition provisions of this Agreement.

(d)     Termination of Employment Due to Disability.   In the event of the termination of Employee's employment with the Company due to Disability, the Company will pay to Employee (1) any Accrued Compensation, as defined in Section 10(a), (2) the bonus earned by Employee under the Bonus Plans for the year ending prior to or coincident with the termination of Employee's employment to the extent not previously paid or provided for, and (3) the Pro Rata Bonus (as defined in Section 10(c)). The bonus payments (if any) provided for under the prior sentence will be payable in cash on the later of the termination date, or March 15th of the termination year, and such bonus payments will not be subject to any deferral under the IC Program and Employee will not receive any match awards under the IC Program as result of such bonus payments.

If Employee continues to comply with the post employment obligations under this Agreement for the Restricted Period (as defined in Section 18(a)), and if Employee (or Employee's guardian or personal representative) executes a Release (as defined in Section 10(a)) as soon as administratively feasible following the date of termination, Employee and, where applicable, Employee's spouse and eligible dependents, will receive Benefit Continuation Coverage. If and to the extent the group health coverage under the Benefit Continuation Coverage is not permitted by the applicable plan or law, Employee's COBRA coverage will begin immediately upon termination, and the Company will pay the premiums for group health coverage for Employee and, where applicable, Employee's spouse and eligible dependents, under COBRA during the 12 month period following termination. If Employee is eligible for the group health coverage under the Benefit Continuation Coverage, the Benefit Continuation Coverage will not be considered COBRA continuation coverage, and Employee and, where applicable, Employee's spouse and eligible dependents, will be eligible to exercise his, her or their rights under COBRA, at his, her or their expense, upon the expiration of the Benefit Continuation Coverage period.

If Employee (or Employee's guardian or personal representative) executes a Release (as defined in Section 10(a)) as soon as administratively feasible following the date of termination, and if Employee complies with the non-solicitation and non-competition provisions of this Agreement for the Restricted Period (as defined in Section 18(a))(or if Employee dies during the Restricted Period, until the Employee's date of death), then upon the expiration of the Restricted Period (or if Employee dies prior to such expiration, upon the Employee's date of death), Employee (or Employee's estate or other beneficiary, if applicable) will receive any additional payments, awards or benefits which Employee is eligible to receive under the IC Program, any Equity Award, any Bonus Plan(s), any Loan Agreements, any Additional Loan Agreements, any Benefit Plan, or any Fringe Benefit Plan, including: (w) all unvested Equity Awards will vest and, as applicable, be payable; (x) all deferred cash bonus payments awarded for service prior to January 1, 2006, if any, will be payable, (y) 100% of the outstanding principal amount and of the accrued interest of the Initial Loan and any Additional Loans will be

12

forgiven, and (z) all options under an Equity Award already vested at termination will be exercisable for 12 months after termination, and all options under an Equity Award that vest upon the expiration of the Restricted Period will be exercisable for 90 days after the date of vesting, and any options that vest upon the date of Employee's death will be exercisable for 12 months after the date of Employee's death.

In the event Employee ceases to comply with the non-solicitation or non-competition provisions of this Agreement prior to the expiration of the Restricted Period, Employee agrees to repay the then outstanding principal amount and accrued interest under the Initial Loan and any Additional Loans (each to the extent not previously forgiven) within 10 days of such non-compliance.

(e)     Termination of Employment Due to Death.  In the event of the termination of Employee's employment with the Company due to death, the Company will pay to Employee's estate or other beneficiary (1) any Accrued Compensation (as defined in Section 10(a)), (2) the bonus earned by Employee under the Bonus Plans for the year ending prior to or coincident with the termination of Employee's employment, to the extent not previously paid or provided for, and (3) the Pro Rata Bonus (as defined in Section 10(c)).  The bonus payments (if any) provided for under the prior sentence will be payable in cash on the later of the termination date, or March 15th of the termination year, and such bonus payments will not be subject to any deferral under the IC Program and Employee will not receive any match awards under the IC Program as result of such bonus payments.

If Employee's estate or other beneficiary executes a Release (as defined in Section 10(a)) as soon as administratively feasible following the date of death, Employee's spouse and eligible dependents will receive continued group health and group life insurance coverage during the 12 month period following Employee's death at the same benefit and contribution levels in effect from time to time with respect to spouses and eligible dependents of active employees of the Company ("Death Benefit Continuation Coverage").  If and to the extent the group health coverage under the Death Benefit Continuation Coverage is not permitted by the applicable plan or law, COBRA coverage will begin immediately upon Employee's death, and the Company will pay the premiums for group health coverage, where applicable, for Employee's spouse and eligible dependents under COBRA during the 12 month period following Employee's death.  If Employee's spouse and eligible dependents are eligible for the group health coverage under the Death Benefit Continuation Coverage, the Death Benefit Continuation Coverage will not be considered COBRA continuation coverage, and Employee's spouse and eligible dependents will be eligible to exercise his, her or their rights under COBRA, at his, her or their expense, upon the expiration of the Death Benefit Continuation Coverage period.

If Employee's estate or other beneficiary executes a Release (as defined in Section 10(a)) as soon as administratively feasible following the date of death, Employee's estate or other beneficiary will also receive any additional payments, awards, or benefits, if any, which Employee's estate or other beneficiary is eligible to receive under the IC Program, any Equity Award, any Bonus Plan(s), any Loan Agreements, any Additional Loan Agreements, any Benefit Plan, or any Fringe Benefit Plan, including: (w) all unvested Equity Awards will vest and, as applicable, be payable; (x) all deferred cash bonus payments awarded for service prior to January

13

1, 2006, if any, will be payable, (y) 100% of the outstanding principal amount and of the accrued interest of the Initial Loan and any Additional Loan Agreement(s) will be forgiven, and (z) all options under an Equity Award will be exercisable for 12 months after death.

(f) <u>Termination of Employment Due to Retirement.</u> In the event of termination of Employee's employment with the Company due to Retirement by Employee pursuant to Section 9(h), the Company will pay Employee the Accrued Compensation (as defined in Section 10(a)), plus the bonus earned by Employee under the Corporate Finance EBITDA and Hours Bonus Plans (or their successor bonus plans, if any) for the year ending prior to or coincident with the termination of Employee's employment, to the extent not previously paid or provided for. The bonus payments (if any) provided for under the prior sentence will be payable in cash on the later of the termination date, or March 15th of the termination year, and such bonus payments will not be subject to any deferral under the IC Program and Employee will not receive any match awards under the IC Program as result of such bonus payments.

Employee will be eligible to exercise his or her rights to COBRA coverage for Employee and, where applicable, Employee's spouse and eligible dependents, at Employee's expense, upon termination of Employee's employment.

If Employee executes a Release (as defined in Section 10(a)) on or about the date of termination, and if Employee continues to comply with the non-solicitation and non-competition provisions of this Agreement through the applicable vesting, exercise, forgiveness or payment date, Employee will receive any additional payments, awards, or benefits which Employee is eligible to receive under the IC Program, any Equity Award, any Bonus Plan(s), any Loan Agreement, any Additional Loan Agreements, any Benefit Plan, or any Fringe Benefit Plan, including: Equity Awards will continue to vest and, as applicable, be exercisable or payable, and principal and interest of the Initial Loan and any Additional Loans will continue to be forgiven, all as if Employee had continued employment.

In the event Employee dies while in Retirement status and prior to the complete forgiveness of the Initial Loan and any Additional Loans, or complete vesting of any Equity Awards, upon such death: (x) all unvested Equity Awards will vest and, as applicable, be payable, (y) 100% of the outstanding principal amount and of the accrued interest of the Initial Loan and any Additional Loan Agreement(s) will be forgiven, and (z) all options under an Equity Award will be exercisable for 12 months after death.

In the event Employee ceases to comply with the non-solicitation or non-competition provisions of this Agreement prior to the complete forgiveness of such loans, Employee agrees to repay the then outstanding principal amount and accrued interest under the Initial Loan and any Additional Loans (each to the extent not previously forgiven) within 10 days of such non-compliance.

(g) <u>Timely Execution of Release.</u> The failure to timely execute a Release on or about the applicable date of termination, or as soon as administratively feasible following the date of termination in the case of termination due to Disability or death, as required under

14

Sections 10(a)-(f) above by Employee (or if applicable, Employee's estate or beneficiary, or legally authorized guardian or personal representative) shall result in: (i) one hundred percent (100%) of the then outstanding principal amount and accrued interest under the Initial Loan and any Additional Loans (each to the extent not previously forgiven) being due and payable in full within 10 days of such failure, and (ii) forfeiture of all outstanding Equity Awards upon such failure. The determination of whether a Release is timely executed on or about the applicable date of termination, or as soon as administratively feasible following the date of termination in the case of termination due to Disability or death, as provided under Sections 10(a)-(f) above, shall be made by the Company in its reasonable discretion; provided however, that the Company must notify Employee (or if applicable, Employee's estate or beneficiary, or legally authorized guardian or personal representative) in writing that the Release must be timely executed, and provide Employee 60 days after receipt of such notice to provide an executed Release to the Company. If Employee fails to provide an executed Release to the Company within the 60-day period, the failure to timely execute a Release shall be deemed to occur upon the expiration of such 60-day period.

11.   **Restrictive Covenants.**

(a)   **Sufficiency of Consideration.**   Employee acknowledges that the consideration that Employee will receive pursuant to this Agreement serves as sufficient consideration for Employee's promises to abide by the restrictive covenants set forth in sections 11 through 20 of this Agreement.

(b)   **Survival Post-Termination.**   The rights and obligations set forth in Sections 11 through 20 of this Agreement will survive termination of this Agreement and of Employee's employment with the Company.

12.   **Non-Competition Covenants.**

Employee acknowledges that during the Restricted Period (defined below), Employee will not, directly or indirectly, be employed by (where Employee's employment would involve any level of strategic, advisory, technical, creative, sales, or other similar input), lend money to, invest in, or engage in a Competing Business (defined below) in any Market Area (defined below). That prohibition includes, but is not limited to, acting, either singly or jointly or as agent for, or as an employee of or consultant or independent contractor to, any one or more persons, firms, entities, or corporations directly or indirectly (as a director, independent contractor, representative, consultant, member, or otherwise) in such Competing Business. Notwithstanding the foregoing, (a) Employee may own up to 5% of the outstanding capital stock of any corporation or other entity that is publicly traded, and (b) following the termination of Employee's employment hereunder, Employee may provide services as an officer, consultant, employee, director, partner or otherwise to an entity engaged in multiple business lines (including a business line that is a Competing Business) provided that the business line(s) for which Employee provides services is not a Competing Business.

15

13.   Non-Solicitation Covenants.  During the Restricted Period, as defined below, Employee will not, directly or indirectly, whether for Employee or for any other individual or entity (other than the Company):

(i)   solicit business regarding any case or matter upon which Employee worked on behalf of the Company during the term of this Agreement;

(ii)   solicit any person or entity who is a client of the Company's business in which Employee was engaged at the time of or at any time within a twenty-four (24) month period of time immediately prior to the termination of Employee's employment with the Company; or

(iii)   solicit, induce or otherwise attempt to influence any person who the Company employs or otherwise engages to perform services including, but not limited to, any employees, independent consultants, engineers, or sales representatives, or any contractor, subcontractor, supplier, or vendor of the Company, to leave the employ of or discontinue providing services to the Company, provided, however, that this restriction will not apply in the case of any clerical employee of the Company or in the case of any other employee whose employment with the Company has been terminated for at least one year.

14.   [Reserved.]

15.   Confidential Information of the Company.  Employee's association with the Company under this Agreement has given and will give Employee access to Confidential Information (defined below) not generally known outside of the Company that may be of value to the Company or that has been given to the Company in confidence by third parties. Employee acknowledges and agrees that using, disclosing, or publishing any Confidential Information in an unauthorized or improper manner would cause the Company substantial loss and damages that could not be readily calculated and for which no remedy at law would be adequate. Accordingly, Employee will not at any time, except in performing the duties of Employee's employment under this Agreement (or with the prior written consent of the Company), directly or indirectly, use, disclose, or publish any Confidential Information that Employee may learn or become aware of, or may have learned or become aware of because of Employee's association with the Company, or use any such information in a manner that is or may reasonably be likely to be detrimental to the business of the Company.  For the purposes hereof, the term "Confidential Information" includes, without limitation, information not previously disclosed to the public or to the trade by the Company with respect to its present or future business, operations, services, products, research, inventions, discoveries, drawings, designs, plans, processes, models, technical information, facilities, methods, trade secrets, copyrights, software, source code, systems, patents, procedures, manuals, specifications, any other intellectual property, confidential reports, price lists, pricing formulas, customer lists, financial information, business plans, lease structure, projections, prospects, or opportunities or strategies, acquisitions or mergers, advertising or promotions, personnel matters, legal matters, any other confidential and proprietary information, and any other information not generally known outside the Company that may be of value to the Company, but excludes any information already properly in the public domain. Confidential Information also includes confidential and proprietary information and trade secrets that third

16

parties entrust to the Company in confidence. The rights and obligations set forth in this Section will continue indefinitely.

16.   Property Rights. Employee confirms that all Confidential Information is and must remain the exclusive property of the Company. All business records, business papers, and business documents kept or created by Employee in the course of Employee's employment by the Company relating to the business of the Company remain the property of the Company. Upon the termination of this Agreement or upon the Company's reasonable request at any time, Employee must promptly deliver to the Company any Confidential Information or other property belonging to the Company (written or otherwise) not otherwise in the public domain. Employee will not, without the Company's consent, retain copies, excerpts, summaries, or compilations of the foregoing information and materials.

17.   Intellectual Property.

(a)   All records, in whatever media, documents, papers, inventions and notebooks, drawings, designs, technical information, source code, object code, processes, methods or other copyrightable or otherwise protected works Employee conceives, creates, makes, invents, or discovers or that otherwise relate to or result from any work Employee performs or performed for the Company or that arise from the use or assistance of the Company's facilities, materials, personnel or Confidential Information in the course of Employee's employment (whether or not during usual working hours), whether conceived, created, discovered, made, or invented individually or jointly with others, will, together with all the worldwide patent, copyright, trade secret, or other intellectual property rights in all such works, be and remain the absolute property of the Company. Employee irrevocably and unconditionally waives all rights that may otherwise vest in Employee (whether before, on, or after the date of this Agreement) in connection with Employee's authorship of any such copyrightable or patentable works in the course of Employee's employment with the Company, wherever in the world enforceable. Without limitation, Employee waives the right to be identified as the author of any such works and the right not to have any such works subjected to derogatory treatment. Employee recognizes any such works are "works for hire" of which the Company is the author.

(b)   Employee will promptly disclose, grant and assign ownership to the Company for its sole use and benefit any and all ideas, processes, inventions, discoveries, improvements, technical information, copyrightable works and/or patentable works that Employee develops, acquires, conceives or reduces to practice (whether or not during usual working hours) while employed by the Company. Employee will promptly disclose and hereby grant and assign ownership to the Company of all patent applications, letter patent, utility and design patents, copyrights and reissues thereof, or any foreign equivalents thereof, that may at any time be filed or granted for or upon any such invention, improvement, or information. In connection therewith:

(i)   Employee will, without charge but at the Company's expense, promptly execute and deliver such applications, assignments, descriptions and other instruments as the Company may consider reasonably necessary or proper to vest title to any such inventions,

17

discoveries, improvements, technical information, patent applications, patents, copyrightable work or reissues thereof in the Company and to enable it to obtain and maintain the entire worldwide right and title thereto: and

    (ii) Employee will provide to the Company at its expense all such assistance as the Company may reasonably require in the prosecution of applications for such patents, copyrights or reissues thereof, in the prosecution or defense of interferences that may be declared involving any such applications, patents or copyrights and in any litigation in which the Company may be involved relating to any such patents, inventions, discoveries, improvements, technical information or copyrightable works or reissues thereof. The Company will reimburse Employee for reasonable out-of-pocket expenses incurred and pay Employee reasonable compensation for Employee's requested time if the Company no longer employs Employee.

    (c) To the extent, if any, that Employee owns rights to works, inventions, discoveries, proprietary information, and copyrighted or copyrightable works, or other forms of intellectual property that are incorporated in the work product Employee creates for the Company. Employee agrees that the Company will have an unrestricted, nonexclusive, royalty-free, perpetual, transferable license to make, use, sell, offer for sale, and sublicense such works and property in whatever form, and Employee hereby grants such license to the Company.

    (d) This Section (relating to Copyright, Discoveries, Inventions and Patents) does not apply to an invention for which no equipment, supplies, facility or trade secret information of the Company (including any of its predecessors) was used and that was developed entirely on Employee's own time, unless (a) the invention relates (i) directly to the business of the Company, or (ii) the Company's actual or anticipated research or development, or (b) the invention results from any work Employee performed as an employee of the Company. The rights and obligations set forth in this Section will continue indefinitely.

  18. <u>Definitions</u>.  For purposes of Sections 11 through 17, the following terms will have the meaning set forth below:

    (a) <u>Restricted Period</u>.  The term "Restricted Period" means the period beginning on the date of the execution of this Agreement and ending on the expiration of the period ending twelve (12) months from the termination date of Employee's employment for any reason, including the non-renewal of this Agreement.  Notwithstanding the foregoing, (i) the duration of the Restricted Period will be extended by the amount of any and all periods that Employee violates the covenants of any of Sections 12 and 13, and (ii) the Restricted Period will earlier expire upon the failure of the Company to make any payments due to Employee prior to the expiration of the Restricted Period, provided, however, that Employee must specify in writing to the Company the act or omission that Employee deems to constitute such payment failure of the Company and provide the Company 30 days after receipt of such notice to correct the situation (and thus prevent the earlier expiration of the Restricted Period), and provided further that Company will not thereby be relieved of any payment or forgiveness obligations to Employee under this Agreement or related agreements contemplated by this Agreement (including, without limitation, the Equity Awards, the Initial Loan, any Additional Loans, the Bonus Plans and the IC Program).

(b)  Competing Business.  The term "Competing Business" means any line of business, in which Employee was substantially engaged or about which Employee gained substantial Confidential Information during Employee's employment with the Company, that is either (a) conducted by the Company during the period of Employee's employment with the Company and at the time Employee's employment ends, or (b) planned or proposed by the Company at any time during the last twenty-four (24) months of Employee's employment with the Company.

(c)  Market Area.  The term "Market Area" means any place, including but not limited to the continental United States, the United Kingdom and Australia, where the Company conducts any business, in which Employee was substantially engaged or about which Employee gained substantial Confidential Information, that was either conducted, planned or proposed by the Company at any time during the last twenty-four (24) months of Employee's employment with the Company.  Employee acknowledges that due to the nature of the business conducted by the Company, this geographic scope is reasonable and necessary to protect the Company's legitimate protectable interests.

19.  Enforceability.  If any of the provisions of Sections 11 through 18 are deemed by a court or arbitrator having jurisdiction to exceed the time, geographic area, or activity limitations the law permits, the limitations will be reduced to the maximum permissible limitation, and Employee and the Company authorize a court or arbitrator having jurisdiction to reform the provisions to the maximum time, geographic area, and activity limitations the law permits; *provided, however,* that such reductions apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

20.  Remedies.  Without limiting the remedies available to the parties, each party acknowledges that a breach of any of the covenants in Sections 11 through 17 would result in material irreparable injury to the Company for which there is no adequate remedy at law, and that it will not be possible to measure damages for such injuries precisely.  The parties agree that, if there is a breach or threatened breach of such covenants, the Company will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining Employee from engaging in prohibited activities or such other relief as may be required to specifically enforce any of said covenants.  In addition, the Company will be relieved of any obligation to provide to Employee any post-employment payments, benefits, awards, loan forgiveness, or extended vesting or exercise periods under this Agreement, any Equity Award, any Loan or Additional Loan Agreement, any Bonus Plan, the IC Program, or any Benefit or Fringe Benefit Plan which would otherwise occur, be continued, or become due and payable following such breach or threatened breach.  Further, in the event Employee violates the non-solicitation or non-competition provisions of this Agreement after a Change in Control (as defined in Exhibits E-1 and F-1) and prior to the earlier of (i) Employee completing six years of consecutive Service (as defined in Section 9(i)) or (ii) the expiration of the Restricted Period, Employee must immediately repay to the Company the value (as such value is determined under such Exhibits) of any options or restricted stock that vested as a result of the Change in Control.  Each party agrees that all remedies expressly provided for in this Agreement are cumulative of any and all other remedies now existing at law or in equity.  In addition to the remedies provided in this Agreement, the parties will be entitled to avail themselves of all such other remedies as

19

may now or hereafter exist at law or in equity for compensation, and for the specific enforcement of the covenants contained in Sections 11 through 17. Resort to any remedy provided for in this Section or provided for by law will not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies, or preclude a recovery of monetary damages and compensation. Each party agrees that no party hereto must post a bond or other security to seek an injunction. In the event that an arbitrator or court of competent jurisdiction declares that any of the remedies outlined in this Section 20 are unavailable as a matter of law, the remainder of the remedies outlined in this Section shall remain available to the Company.

21.    Assignment. The Company may assign or otherwise transfer this Agreement and any and all of its rights, duties, obligations, or interests under it to (a) any of the Company's affiliates or subsidiaries; or (b) any successor to all or a material part of the business of the Company, or all or part of the Company's Corporate Finance/Restructuring practice or a division of the Company's Corporate Finance/Restructuring practice (directly or indirectly). Upon such assignment or transfer, any such business entity will be deemed to be substituted for the Company for all purposes. Without the Company's prior written consent, Employee may not assign or delegate the obligations of Employee under this Agreement. The Company shall require any successor to all or substantially all of the business and/or assets of Company, or the Company's Corporate Finance/Restructuring practice, or a division of the Company's Corporate Finance/Restructuring practice in which Employee is then employed, to expressly assume this Agreement.

22.    Severability. If the final determination of an arbitrator or a court of competent jurisdiction declares, after the expiration of the time within which judicial review (if permitted) of such determination may be perfected, that any term or provision of this Agreement is invalid or unenforceable, the remaining terms and provisions will be unimpaired, and the invalid or unenforceable term or provision will be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. Any prohibition or finding of unenforceability as to any provision of this Agreement in any one jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction.

23.    Amendment; Waiver. Except as provided in Section 31, neither Employee nor the Company may modify, amend, or waive the terms of this Agreement other than by a written instrument signed by Employee and the Company. Either party's waiver of the other party's compliance with any specific provision of this Agreement is not a waiver of any other provision of this Agreement or of any subsequent breach by such party of a provision of this Agreement. No delay on the part of any party in exercising any right, power or privilege hereunder will operate as a waiver thereof.

24.    Withholding. The Company will reduce its compensatory payments to Employee hereunder for withholding and FICA and Medicare taxes and any other withholdings and contributions required by law.

25.    Governing Law. The Agreement will be governed by the laws of the State of Maryland, without regard to any conflict of laws provisions.

20

26.  Notices.  Notices may be given in writing by personal delivery, by certified mail, return receipt requested, by telecopy, or by overnight delivery.  Employee should send or deliver notices to the Company, to the attention of the Chief Risk Officer, at 500 East Pratt Street, Baltimore, Maryland 21202, fax number: (410) 224-7868.  The Company will send or deliver any notice given to Employee at Employee's address as reflected on the Company's personnel records.  Employee and the Company may change the address for notice by like notice to the other party.  Employee and the Company agree that notice is deemed received on the date it is personally delivered, the date it is received by certified mail, the date of guaranteed delivery by overnight service, or the date the fax machine confirms receipt.

27.  Superseding Effect.  This agreement supersedes all prior or contemporaneous negotiations, commitments, agreements, and writings between Employee and the Company with respect to the subject matter.  All such other negotiations, commitments, agreements, and writings will have no further force or effect, and the parties to any such other negotiation, commitment, agreement, or writing will have no further rights or obligations thereunder.  Notwithstanding this provision, the terms of the Company's IC Program, Benefit Plans, Fringe Benefit Plans, any deferred compensation plans, stock plans, stock option plans or any other benefit or award plans which are in effect will continue to be governed in accordance with their respective terms, and this Agreement does not supersede any bonus, stock option or restricted stock award made in connection with Employee's employment with the Company prior to the Execution Date.

28.  Arbitration.

(a)  Arbitrable Claims.  The Company and Employee agree to attempt to resolve any employment related dispute between them quickly and fairly.  Any such dispute which remains unresolved (including, but not limited to, disputes concerning employment with and/or termination of employment from the Company, the validity, interpretation, enforceability or effect of this Agreement or alleged violations of this Agreement, claims concerning a legally protected right, including without limitation, any common law claims such as breach of contract or commission of a tort, and any claims arising under the federal, state or local civil rights laws, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Americans With Disabilities Act, the Age Discrimination in Employment Act, the Family and Medical Leave Act, 42 U.S.C. § 1981, the Worker Adjustment or Retraining Notification Act, and all other federal, state or local employment related statutes, ordinances and /or common law) shall be resolved exclusively by final and binding arbitration.  Employee acknowledges that Employee waives the right to litigate the foregoing employment related legal claims in a judicial forum before a judge or jury.

This arbitration provision does not apply to (i) any Employee claim for workers compensation benefits, unemployment compensation benefits or denial of benefits under any ERISA plan, or to the filing of charges with government agencies, or (ii) any Company claim regarding theft, embezzlement, fraud, breach of confidentiality or noncompetition or nonsolicitation obligations, or trade secret, trademark, copyright or patent issues.

(b)    Claim Initiation/Time Limits.  A party must notify the other party in writing at the addresses indicated in Section 26 of a request to arbitrate a dispute within the same statute of limitations applicable to the legal claim asserted.  The written request for arbitration must specify:  (i) the factual basis on which the claim is made; (ii) the statutory provision or legal theory under which the claim is made; and (iii) the nature and extent of any relief or remedy sought.

(c)    Procedures.  The arbitration will be administered in accordance with the Employment Dispute Resolution Rules ("Rules") of the American Arbitration Association ("AAA"), a copy of which is available upon request to the Company, in the metropolitan area in which Employee is then (or was last) employed before a single arbitrator, experienced in employment law and licensed to practice law in that jurisdiction, who has been selected in accordance with such Rules.  The Company will pay the fees of the AAA and the arbitrator. However, in the event Employee requests an arbitration, Employee will be required to contribute an amount equal to the fee required to file a complaint of the same type in the state court which is geographically closest to the site of the arbitration. Employee and the Company may be represented by counsel of their choosing at their own expense.  However, attorneys' fees and costs may be awarded to a prevailing party in the discretion of the arbitrator.

(d)    Responsibilities of Arbitrator.  The arbitrator will act as the impartial decision maker of any claims that come within the scope of this arbitration provision.  The arbitrator will have the powers and authorities provided by the Rules and the statute or common law under which the claim is made.  For example, the arbitrator will have the power and authority to include all remedies in the award available under the statute or common law under which the claim is made including, without limitation, the issuance of an injunction.  The arbitrator will apply the elements and burdens of proof, mitigation duty, interim earnings offsets and other legal rules or requirements under the statutory provision or common law under which such claim is made.  The arbitrator will permit reasonable pre-hearing discovery.  The arbitrator will have the power to issue subpoenas.  The arbitrator will have the authority to issue a summary disposition if there are no material factual issues in dispute requiring a hearing and the Company or Employee is clearly entitled to an award in its, his or her favor.  The arbitrator will not have the power or authority to challenge the Company's lawful personnel policies or to substitute his/her business judgment for the lawful business judgment of the Company which is not a breach of the provisions of this Agreement, or any related agreements or plans, including but not limited to the Equity Awards, the Loan Agreements, the Bonus Plans, or the IC Program. The arbitrator will not have the power or authority to add to, detract from or modify any provision of this Agreement, or any related agreements or plans, including but not limited to the Equity Awards, the Loan Agreements, the Bonus Plans or the IC Program.  The arbitrator will not have the power or authority to direct the Company to issue, reissue, value, revalue or take any other similar action with respect to any Equity Awards, and, therefore, any award by the arbitrator in favor of Employee with respect to any Equity Award will be a cash equivalent award.  The arbitrator will issue a signed written opinion and award that will include findings of fact and conclusions of law.  If any monetary award is made, the arbitrator will specify the elements and factual basis for calculating the amount.  The arbitrator's award will be enforceable, and a judgment may be entered thereon, in a federal or state court of competent jurisdiction in the state where the arbitration was held. The decision of the arbitrator will be final

22

and binding, provided, however, limited judicial review may be obtained in a court of competent jurisdiction as permitted under applicable law.

(e)     Section 20 Remedies. Notwithstanding the foregoing, each party shall be entitled to seek injunctive or other equitable relief, as contemplated by Section 20 above, from any court of competent jurisdiction, without the need to resort to arbitration.

29.     Indemnification and Liability Insurance. During the term of this Agreement and after the termination of this Agreement, the Company will indemnify Employee to the fullest extent permitted by applicable law with regard to Employee's actions (or inactions) on behalf of the Company, with advancement of legal fees on a current basis as permitted by law.  The Company will cover Employee under professional and other appropriate liability insurance policies both during and, while any potential liability exists, after the term in the same amount and to the same extent, if any, as the Company covers its senior managing directors.

30.     Cooperation in Legal Matters.  Employee will cooperate with the Company, during the term of Employee's employment and thereafter with respect to any pending or threatened claim, action, suit, or proceeding, whether civil, criminal, administrative, or investigative (the "Claims"), by being reasonably available to testify on behalf of the Company, and to assist the Company by providing information, meeting and consulting with the Company or its representatives or counsel, as reasonably requested.  The Company will reimburse Employee for all out-of-pocket expenses reasonably incurred by Employee in connection with the Employee's provision of such testimony or assistance. If necessary, the Company will provide counsel to Employee at the Company's expense.  Employee agrees not to disclose to or discuss with anyone who is not assisting the Company with the Claims, other than Employee's personal attorney, the fact of or the subject matter of the Claims, except as required by law. Employee further agrees to maintain the confidences and privileges of the Company, and acknowledges that any such confidences and privileges belong solely to the Company and can only be waived by the Company, not Employee.  In the event that Employee is subpoenaed to testify, or otherwise requested to provide information in any matter relating to the Company, Employee agrees to promptly notify the Company after receipt of such subpoena, summons or request for information, to reasonably cooperate with the Company with respect to such subpoena, summons or request for information, and to not voluntarily provide any testimony or information unless required by law or permitted by the Company.

31.     Section 409A Compliance.  It is intended that any income to Employee provided pursuant to this Agreement or other agreements or arrangements contemplated by this Agreement (including, without limitation, the Equity Awards, the Initial Loan, IC Program and related arrangements) will not be subject to interest and additional tax under Section 409A of the Internal Revenue Code of 1986, as amended ("Code Section 409A"). The provisions of the Agreement and such other agreements or arrangements will be interpreted and construed in favor of its meeting any applicable requirements of Code Section 409A. The Company, in its reasonable discretion, may amend (including retroactively) the Agreement and any such other agreements or arrangements in order to conform with Code Section 409A, including amending to facilitate the ability of Employee to avoid the imposition of interest and additional tax under Code Section 409A. The preceding provisions shall not be construed as a guarantee by the

23

Company of any particular tax effect for any income to Employee provided pursuant to the Agreement or other agreements or arrangements contemplated by this Agreement (including, without limitation, the Equity Awards, the Initial Loan, IC Program and related arrangements). In any event, and except for the responsibilities set forth under Section 24, the Company will have no responsibility for the payment of any applicable taxes on income to Employee provided pursuant to this Agreement or other agreements or arrangements contemplated by this Agreement (including, without limitation, the Equity Awards, the Initial Loan, IC Program and related arrangements).

32.     Miscellaneous Provisions.

(a)     This Agreement will be interpreted without reference to any rule or precept of law that states that any ambiguity in a document be construed against the drafter.

(b)     Employee acknowledges that Employee has read and understands this Agreement and is entering into this Agreement knowingly and voluntarily.

(c)     Notwithstanding the termination of Employee's employment hereunder for any reason or anything in this Agreement to the contrary, all post-employment obligations of the parties and any provisions necessary to interpret or enforce those obligations under any provision of this Agreement will survive the termination or expiration of this Agreement and remain in full force and effect for the periods therein provided.

(d)     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**IN WITNESS** . . I have signed this Agreement on the date
specified below.

_Dianne R. Sagner_
Dianne R. SAGNER
Manager & Secretary
6/21/06

. . . SULTING, INC.
_Eric B. Miller_
ERIC B. MILLER
Senior VP & General Counsel
6/21/06

. . .
_Robert J. Duffy_
Robert J Duffy
SMD, Senior Managing Director,
Northeast Region Leader
6/14/06